UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


FELIPE C. ALMONTE,                    :
a.k.a. Felipe Polanco,                :
                Plaintiff,            :
                                      :
        v.                            :    CA 08-529 ML
                                      :
RICARDO M. SILVA, PATROLMAN           :
COLT, JOHN DOE, LIEUTENANT            :
DEAN M. ESSERMAN, CHIEF,              :
CITY OF PROVIDENCE, by and            :
through its Treasurer,                :
Stephen Napolitano,                   :
                Defendants.           :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

    This is an action pursuant to 42 U.S.C. § 1983 brought by
Plaintiff Felipe C. Almonte, a.k.a. Felipe Polanco ("Plaintiff,"
"Almonte," or "Polanco"), against three named members of the
Providence Police Department[1] and the City of Providence
(collectively "Defendants") for alleged violations of his civil
rights.  Plaintiff also asserts state law claims of assault and
battery, malicious prosecution, and abuse of process.

    Before the Court are cross motions for summary judgment
filed by Plaintiff and Defendants.  The motions have been
referred to me for preliminary review, findings, and recommended
disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  A hearing was
held on December 4, 2009.  After reviewing the filings, listening
to oral argument, and performing independent research, I
recommend that Defendants' Motion for Summary Judgment (Document
("Doc.") #70) ("Defendants' Motion for Summary Judgment" or

---

    [1] Defendant John Doe has not been further identified and has not
been served.

"Defendants' Motion") be granted in part and denied in part.  I further recommend that Plaintiff's Motion for Summary Judgment(s) (Doc. #68) ("Plaintiff's Motion for Summary Judgment" or "Plaintiff's Motion") be denied.

## I. **Plaintiff's Claims**

Plaintiff makes the following allegations in his Amended Complaint (Doc. #19).  On or about October 29,[2] 2007, Plaintiff and two of his friends were on the porch of Plaintiff's home in Providence, Rhode Island.  Amended Complaint ¶ 5.  Two Providence Police officers, Patrolman Ricardo M. Silva ("Silva") and Patrolman Peter Colt ("Colt"), who were on bicycles, approached Plaintiff and his friends.  Id.  The officers called Plaintiff and his friends down from the porch and detained, questioned, and searched them without justification or their consent.  Id.  The search of Plaintiff included turning his pockets inside-out and searching the lining of his coat.  Id. ¶ 6.  After the search had been completed and the men had answered all of the questions which the officers had posed to them, Plaintiff told Silva that he was going to call his lawyer for the illegal detention and search.  Id. ¶ 7.  Upon hearing this, Silva grabbed Plaintiff by the coat, took Plaintiff's cell phone, and threw him against a van which was parked in front of Plaintiff's residence.  Id. ¶ 8.  Silva then handcuffed Plaintiff and told him that he was being charged with assaulting a police officer.  Id.  Plaintiff was placed on the ground in view of his neighbors and passersby to

---

[2] Although the police report in the record states that the incident which precipitated the instant lawsuit occurred on October 29, 2007, the report was prepared at 01:12 a.m. on October 29th and describes events occurring before midnight.  See Plaintiff's Exhibits (Doc. #90) at 4 (Providence Incident Report).  Plaintiff was arrested before midnight, held overnight, and arraigned in the state district court the following morning.  The arraignment date shown on the criminal complaint is "10/29/07."  Id. at 2 (state district court criminal complaint).  Thus, the likely date of the incident was October 28, 2007.

await transportation to the police station.  Id.  He was
subsequently taken to the police station where he was subjected
to a strip search which included a "private parts cav[i]ties
search."[3]  Id.  Plaintiff was held overnight, arraigned in court
the next morning, and then transported to the state prison.  Id.

Plaintiff makes the following additional allegations.  Silva
and Colt falsely charged Plaintiff with assaulting a police
officer to cover up their wrongful actions.  Id. ¶ 9.  Silva
filed a false police report regarding the incident and testified
at Plaintiff's trial in the state district court in accordance
with this report, stating that Plaintiff had thrown several
punches at him without hitting Silva or causing him to duck.[4]
Id.  Plaintiff was found not guilty of assault on or about
December 11, 2007, after a trial before a state district court
judge.[5]  Id.  Thereafter, "Silva pressed, encouraged[,] and
continued to pursue new charges of 'Disorderly Conduct' in
Providence Superior Court against the [P]laintiff."  Id. ¶ 10.
This new charge was dismissed by Superior Court Justice Robert

---

[3] The Court interprets the quoted language as alleging that
Plaintiff's private parts were visually inspected.  Plaintiff has not
indicated in any of his filings or in his testimony at the criminal
trial that the search was more intrusive than this.  Cf. Sanchez v.
Pereira-Castillo, 590 F.3d 31, 43 (1st Cir. 2009)(distinguishing
between body cavity searches which are "purely visual" and those
involving "touching and intrusion" and characterizing this distinction
as "significant"); see also Bell v. Wolfish, 441 U.S. 520, 558 & n.39,
99 S.Ct. 1861 (1979)(holding that a body cavity search was
constitutional, while noting that "the inmate is not touched by
security personnel at any time during the visual search procedure").

[4] The only police report in the record does not contain the
statements Plaintiff alleges.  See Plaintiff's Exhibits at 4.
Similarly, the trial transcript does not reflect any testimony by
Silva that Plaintiff threw "several punches at him ...."  Amended
Complaint (Doc. #19) ¶ 9; see also Trial Transcript ("Tr. T."); id. at
11 (testifying Plaintiff "made a swing-like motion").

[5] Plaintiff was found guilty of what the district judge termed
the lesser included offense of disorderly conduct.  Tr. T. at 64.

Krause on October 23, 2008.  Id.

Plaintiff alleges on information and belief that Silva and Colt get a bonus of $50 from the City of Providence for each arrest which they make.  Id. ¶ 11.  Plaintiff claims that Colt conspired with Silva and aided and abetted him in the violation of Plaintiff's constitutional rights.  Id.  Plaintiff alleges that Lieutenant John Doe ("Doe") negligently and/or recklessly sent Silva and Colt into the neighborhood to investigate wrong-doing when they lacked proper training, experience, and knowledge to perform such tasks.  Id. ¶ 12.  Plaintiff further alleges that Doe acted in the course of his employment by the City and that he, Chief Dean M. Esserman ("Esserman"), and the City of Providence ("the City") are vicariously liable according to the principle of respondeat superior.  Id.

Plaintiff claims that his detention, search, arrest, and prosecution were in violation of rights guaranteed to him under the Fourth and Fourteenth Amendments to the U.S. Constitution, Article I, Section 6 of the Rhode Island Constitution, and R.I. Gen. Laws §§ 12-7-1 and 12-7-2.[6]  Id. ¶¶ 15-21.  He additionally

---

[6] R.I. Gen. Laws §§ 12-7-1 and 12-7-2 state:

12-7-1.  Temporary detention of suspects. – A peace officer may detain any person abroad whom he or she has reason to suspect is committing, has committed, or is about to commit a crime, and may demand of the person his or her name, address, business abroad, and destination; and any person who fails to identify himself or herself and explain his or her actions to the satisfaction of the peace officer may be further detained and further questioned and investigated by any peace officer; provided, in no case shall the total period of the detention exceed two (2) hours, and the detention shall not be recorded as an arrest in any official record.  At the end of the detention period the person so detained shall be released unless arrested and charged with a crime.

12-7-2.  Search of detained person for weapons. – A peace officer may search for a dangerous weapon any person he or she is questioning or about to question concerning any crime or suspected crime, whenever the officer reasonably believes that

claims that the officers[7] used excessive force, deprived him of his property (cellphone), and committed the torts of assault and battery, abuse of process, and malicious prosecution.[8]  <u>Id.</u> ¶¶ 17-20.

## II.  **Travel**

Plaintiff filed his pro se Complaint (Doc. #1) on December 23, 2008.  <u>See</u> Docket.  He subsequently moved for and was granted leave to file an amended complaint.  <u>See</u> Motion to Amend/Correct Complaint (Doc. #11) ("Motion to Amend").  In the order granting leave, the Court ruled that the proposed amended complaint which Plaintiff had attached to his Motion to Amend would constitute the amended complaint.  <u>See</u> Order Granting Motion to Amend (Doc. #17); <u>see also</u> Amended Complaint (Doc. #19).

Plaintiff filed his Motion for Summary Judgment on October 13, 2009.  <u>See</u> Docket.  Defendants' Motion for Summary Judgment

---

he or she is in danger from the person carrying a weapon, and if the person is carrying a dangerous weapon, an officer may take and keep it until the completion of questioning, when he or she shall either return it or arrest the person.

R.I. Gen. Laws §§ 12-7-1, 12-7-2 (2002 Reenactment).

[7] In stating that Plaintiff alleges that the "officers" did these acts, the Court reads his Amended Complaint generously.  <u>See</u> Amended Complaint ¶¶ 17, 20 (appearing to allege that only Silva committed the torts of assault and battery, malicious prosecution, and abuse of process).

[8] Plaintiff states that he also seeks summary judgment on claims of false imprisonment, defamation, and slander.  <u>See</u> Plaintiff's Motion for Summary Judgment (Doc. #68).  However, these claims are not pled in his Amended Complaint.  While the Court is cognizant of its obligation to read Plaintiff's pro se Amended Complaint "generously," <u>De Aza-Paez v. United States</u>, 343 F.3d 552, 553 (1st Cir. 2003); <u>see also Rodi v. Ventetuolo</u>, 941 F.2d 22, 23 (1st Cir. 1991)("Because [plaintiff] appeared pro se, we read his complaint with an extra degree of solicitude."), these claims are not discernable from the pleading.  Even if they were discernable, Defendants would be entitled to summary judgment as to them because, as explained herein, Silva had probable cause to arrest Plaintiff and charge him with assault.

was filed two days later.  <u>See</u> <u>id.</u>  Plaintiff moved for oral
argument and for a hearing *in camera* and for identification of
the informant.  <u>See</u> Motion for Oral Argument (Doc. #74).  The
Court granted the request for oral argument and denied the
request for a hearing *in camera* and for identification of the
informant.  <u>See</u> Order of 12/4/09.  Plaintiff also filed a motion
asking that the Court delay ruling on the motions for summary
judgment until discovery which Plaintiff had sent to Defendants
had been completed.  <u>See</u> Motion to Delay on Summary Judgment
(Doc. #82) ("Motion to Delay").  Because of the Motion to Delay,
the Court scheduled the hearing on the summary judgment motions
for December 4, 2009, to allow sufficient time for discovery.
<u>See</u> Order Ruling Moot Motion to Delay Ruling (Doc. #95).  The
hearing was held on December 4, 2009.  At that time, Plaintiff
voiced no objection to proceeding with oral argument on the
summary judgment motions, and the Court assumed that the Motion
to Delay was moot.[9]  <u>See</u> <u>id.</u>  The arguments proceeded, and
thereafter the Court took the motions under advisement.

## III.  **Summary Judgment Standard**

"Summary judgment is appropriate if 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'"  <u>Commercial Union
Ins. Co. v. Pesante</u>, 459 F.3d 34, 37 (1st Cir. 2006)(quoting Fed.
R. Civ. P. 56(c)); <u>accord</u> <u>Kearney v. Town of Wareham</u>, 316 F.3d
18, 21 (1st Cir. 2002).  "A dispute is genuine if the evidence
about the fact is such that a reasonable jury could resolve the
point in the favor of the non-moving party.  A fact is material
if it carries with it the potential to affect the outcome of the

---

[9] The Court subsequently entered an order so stating.  <u>See</u> Order
Ruling Moot Motion to Delay Ruling (Doc. #95).

suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). "[T]he standards are the same where, as here, both parties have moved for summary judgment." Pacific Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004)(quoting Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002)(citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998)("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."))); see also Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007)("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review.")(quoting Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006)).

The non-moving party may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d at 53 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)). "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving

party." <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94
(1st Cir. 2002)(quoting <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d
836, 842 (1st Cir. 1993))(alteration in original)(internal
quotation marks omitted).

"[W]hen the facts support plausible but conflicting
inferences on a pivotal issue in the case, the judge may not
choose between those inferences at the summary judgment stage."
<u>Coyne v. Taber Partners I</u>, 53 F.3d 454, 460 (1st Cir. 1995).
Furthermore, "[s]ummary judgment is not appropriate merely
because the facts offered by the moving party seem more
plausible, or because the opponent is unlikely to prevail at
trial.  If the evidence presented is subject to conflicting
interpretations, or reasonable men might differ as to its
significance, summary judgment is improper."  <u>Gannon v.
Narragansett Elec. Co.</u>, 777 F. Supp. 167, 169 (D.R.I. 1991)
(citation and internal quotation marks omitted).

## IV.  Defendants' Motion for Summary Judgment

### A.  Facts in Light Most Favorable to Plaintiff

On or about October 28,[10] 2007, at approximately 10:15 p.m.,
Silva and Colt were patrolling the area around Parade Street in
Providence, Rhode Island, on bicycles.  Trial Transcript ("Tr.
T.")[11] at 5.  Silva later testified that "we were aggressively
patrolling the area," <u>id.</u>, because the police department had
received numerous complaints about loitering, prostitution, and
drug activity in the area, <u>id.</u>  As they approached 85 Parade
Street, Silva observed four men,[12] <u>id.</u>, on the porch of the

_____

[10] <u>See</u> n.2.

[11] The Tr. T. is located beginning at page 6 of Plaintiff's
Exhibits.

[12] Silva testified that there were four men.  Tr. T. at 5, 15.
Plaintiff testified at the criminal trial that he was with "a couple
of friends ...," <u>id.</u> at 44, but at his deposition he confirmed that

house, <u>id.</u> at 44.   Nothing in particular about the men attracted
Silva's attention other than the aforementioned general
complaints,[13] <u>id.</u> at 6, and the men were not engaged in any of
the activities about which the police had received complaints,[14]
<u>id.</u> at 17-18.

    The men were Plaintiff, Jose Luciano ("Luciano"), Juan

---

there were three other men with him when he was arrested, <u>see</u>
Deposition Transcript ("Dep. T.") at 49 ("I was with the gentlemen
that Mr. Silva put on the record."); <u>id.</u> at 51 (confirming that there
were "three other guys").

   [13] Silva's testimony as to this fact is reproduced below:

      JUDGE:   What, if anything, attracted your attention
            to these individuals?

      OFF. SILVA:   Ah, it was, ah, to do with just the,
                ah, the activities going on.
....

    Q.   So what, what activities do you mean?  What activities
       --

    A.   Just by the loitering, the hanging out, ah, just the
       complaints from the, ah, community, ah, the
       residents in the area from community meetings.

Tr. T. at 6.

   [14] Silva's testimony at the criminal trial on this point is
reproduced below.

    Q.   All right.  Ah, you didn't see them prostituting
       themselves, did you?

    A.   No, I did not.

    Q.   Okay, you didn't, they weren't loitering, were they?

    A.   I guess not.

    Q.   And they weren't selling drugs, were they?

    A.   No, not to my knowledge.

Tr. T. 17-18.

Sanchez, and Daniel Vega.   Deposition Transcript[15] ("Dep. T.") at 50-51; see also Plaintiff's Exhibits (Doc. #90) at 4 (Providence Incident Report).   They had just stepped onto the porch and were about to enter Plaintiff's first floor apartment where they intended to watch the World Series baseball game on television.[16] Tr. T. at 44-45.   Plaintiff had his phone in his right hand.   Id. at 46.   He had just placed a call to his girlfriend inside the apartment to let her know that his friends were with him and to make sure that she was "decent."   Id. at 47; see also id. at 34.

The police officers stopped in front of the house, and Silva told Plaintiff to come down the steps, Id. at 45.   Plaintiff complied.   Id.   Silva got off his bike, Dep. T. at 58, and began to question Plaintiff, Tr. T. at 46.   Among the questions Silva asked were what Plaintiff and his friends were doing at the location, id., whether Plaintiff had any drugs on him, id., whether Plaintiff had anything (such as needles) which could puncture Silva's hands, id., and whether they had identification, Dep. T. at 59-60.   Plaintiff answered Silva and told him that he did not have any drugs, Tr. T. at 46, or items that could harm Silva, Dep. T. at 58, and that his identification was inside the apartment, Dep. T. at 59-60.   Plaintiff asked if he could go inside to get it, but Silva told him "no, that's okay."   Id. at 60.

Silva began to search Plaintiff's coat and pants pockets, putting his hand in the pockets.   Tr. T. at 46, 53.   Plaintiff became upset and asked Silva if he had a search warrant.   Id. at 46-47.   Silva said no and continued to search Plaintiff.   Id. at 47.   After searching Plaintiff, Silva opened the door of a van

---

[15] The Deposition Transcript is Exhibit B to Defendants' Statement of Undisputed Facts (Doc. #71) ("Defendants' SUF").

[16] Game four of the 2007 World Series was played in Denver, Colorado.

belonging to Luciano, leaned in, and searched it.  Dep. T. at 60, 63-64.

Following the search of the van, <u>id.</u> at 63-64, Silva "grabbed," <u>id.</u> at 60, Plaintiff's "key," <u>id.</u>, or "keys," <u>id.</u> at 64, (presumably to the apartment) and stated that he was going inside to "see what's going on," <u>id.</u> at 60.  Silva put the key in the door.[17]  <u>Id.</u> at 60.  Plaintiff told him that there were "cameras there ...,"[18] <u>id.</u>, and Silva came back to where Plaintiff was standing and threw him the key or keys, <u>id.</u> at 60-61.[19]

Plaintiff stated that he was going to call his lawyer, Tr. T. at 47, because he did not believe that Silva should have searched him without a warrant and Silva had attempted to enter Plaintiff's house, Tr. T. at 54.  As Plaintiff began to enter the number in the phone, Silva grabbed for the phone.[20]  <u>Id.</u> at 47-

---

[17] It is not entirely clear, but it appears that the lock into which Silva inserted the key was located on the front door of the house.  Dep. T. at 60-61, 64.

[18] Plaintiff testified that the camera was "fake," Dep. T. at 61, but that there were signs announcing its presence, <u>id.</u>

[19] It is difficult to determine from the present record the precise order in which the search of Plaintiff's person, Luciano's van, and the attempted entry of Plaintiff's apartment occurred.  The Court's chronology is based on Plaintiff's trial testimony, Tr. T. at 44-55, and his deposition testimony, Dep. T. at 54-65.  The searches and attempted entry could have happened in a sequence other than that described above, but this possibility does not affect the Court's determination of the instant motions for summary judgment.

[20] At his deposition, Plaintiff described this portion of his encounter with Silva:

I said, I'm going to call my lawyer, because you searching me, you asking my guests a bunch of questions, like, if we have drugs, you know what I'm saying, and he didn't want me to, I guess.  He went for the phone, right, and then he said, okay, you under arrest, he grabbed me by here (indicating), and he put me in [sic] the van.  I'm, like, what, are you kidding me?  For what?  Assaulting a police officer.  I said I didn't even

48; <u>see also</u> Dep. T. at 61.  Surprised by this action, Plaintiff pulled the phone back.  Tr. T. 47-48; <u>see also</u> Dep. T. at 61.[21] Silva, believing Plaintiff was about to strike him, "cowered." Tr. T. at 54.  Plaintiff told Silva that he wasn't trying to hit him, <u>id.</u> at 48, but Silva immediately grabbed Plaintiff by his jacket, <u>id.</u> at 24, threw Plaintiff against a van which was parked in front of the house,[22] Dep. T. at 28, and handcuffed him, Tr. T. at 24.  Plaintiff did not resist.  Tr. T. at 24.

At some point in the process of arresting Plaintiff, Silva took Plaintiff's phone from him and placed it on top of the van. <u>Id.</u> at 20.  However, Silva testified that he did not seize the phone in the sense of taking possession of it and bringing it to the police station to be recorded as seized property, <u>id.</u>, and

---

touch you, what are you taking about, assaulting a police officer, so that's about it.  What really hurt me is that I couldn't watch that game.

Dep. T. at 62.

[21] Plaintiff's deposition testimony regarding this appears below:

Q.   You were holding the phone?

A.   I'm holding the phone, but he went quick, so I got startled and I pulled my phone back.

...

Q.   Did he touch the phone, or did you pull it back before --

A.   He didn't get to touch it yet, because I pull it back right away, right behind my back, so, to prevent him from grabbing it ....

Dep. T. at 61.

[22] Silva denies throwing Plaintiff against the van.  Tr. T. at 24 ("I didn't throw him or anything if that's what you're insinuating."). According to Silva, he "grabbed [Plaintiff] by the jacket and ... placed him against the, ah, van and that's when I handcuffed him." <u>Id.</u>

there is no evidence in the record which contradicts his testimony.

During all of this time, Colt, according to Plaintiff, was "just doing nothing, saying nothing, doing nothing." Dep. T. at 65. Colt, in his answers to interrogatories described his role as follows: "Silva placed [Plaintiff] under arrest while I maintained cover, as the other three individuals were still on scene." Defendant Peter Colt's Answers to Plaintiff's Interrogatories ("Colt's Answers"), Answer to Interrogatory Number ("Ans. No.") 18. Silva testified at the criminal trial that as he was arresting Plaintiff, Colt was "telling the other subjects to get against the van." Tr. T. at 25.

Plaintiff was transported to the Central Station and held for the next session of the Sixth Division District Court. Plaintiff's Exhibits at 4 (Providence Incident Report). On October 29, 2007, he was arraigned on a criminal complaint charging him with assaulting Silva. Id. at 2 (Criminal Complaint). Bail was set at $3,000 with surety, and Plaintiff was referred to the public defender for legal representation. Id.

At a trial held on December 11, 2007, a state district court judge found Plaintiff guilty of what the judge termed the "lesser included offense of disorderly, tumultuous conduct." Tr. T. at 62; see also id. at 64.[23] The judge fined Plaintiff fifty dollars and imposed court costs. Id. at 65. Plaintiff immediately exercised his right of appeal, id., and the matter was transferred to the state superior court for a trial de novo, see Plaintiff's Exhibits at 1 (Order of Dismissal entered in

_____

[23] The district judge stated that he also found the other three men guilty of disorderly conduct. Tr. T. at 65. As it does not appear that they were before the court, the judge's purpose in making this finding is unclear. Id.

13

superior court).

On October 23, 2008, a superior court judge granted a motion to dismiss the disorderly charge which Plaintiff had appealed before the district court judge.  This action resulted in the dismissal of the charge.

## B.  Findings as to Each Defendant

### 1.  Silva

Defendants' Motion should be denied to the extent that Plaintiff's claims are based on actions taken by Silva prior to Plaintiff's pulling the phone back and placing Silva in fear for his safety.  Defendants' Motion should be granted to the extent that Plaintiff's claims are based on any actions taken by Silva after Plaintiff pulled the phone back.  See Tr. T. at 47-48; see also Dep. T. at 61.  For the reasons explained hereafter, Silva had probable cause to arrest Plaintiff for assault after Plaintiff pulled the phone back.  As a result, Silva could use a reasonable amount of force to effectuate the arrest, and he could lawfully search Plaintiff incident to that arrest.  In addition, Silva could charge Plaintiff with assault and testify in support of that charge without being liable to Plaintiff.

### a.  Stop, Detention, and Search Prior to Arrest

Plaintiff testified that he and his friends were on his porch when Silva called them down to the sidewalk.  Tr. T. at 45.  Viewing the evidence in the light most favorable to Plaintiff, this was not a request but a directive.  Accordingly, the Court finds that this action by Silva constituted a Terry stop.  See Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868 (1968).  "When conducting a Terry stop, a police officer may briefly detain an individual for questioning if the officer has 'reasonable suspicion supported by articulable facts that criminal activity '"may be afoot."'"  Schubert v. City of Springfield, 589 F.3d 496, 501 (1st Cir. 2009)(quoting United States v. Sokolow, 490

14

U.S. 1, 7, 109 S.Ct. 1581 (1989)); <u>see also</u> <u>United States v.</u>
<u>Wright</u>, 582 F.3d 199, 205 (1st Cir. 2009).

> In determining whether a <u>Terry</u> stop is justified, our
> inquiry involves two steps, first, "whether the officer's
> action was justified at its inception," and second,
> "whether it was reasonably related in scope to the
> circumstances which justified the interference in the
> first place." <u>Terry</u>, 392 U.S. at 20, 88 S.Ct. 1868.  The
> initial stop requires reasonable suspicion, which must be
> rooted in "a particularized and objective basis" for
> suspecting illegal conduct on the part of the person
> stopped. <u>Wright</u>, 582 F.3d at 205 (quoting <u>Ornelas v.</u>
> <u>United States</u>, 517 U.S. 690, 696, 116 S.Ct. 1657 ...
> (1996)).  The particularity requirement is satisfied by
> a finding "grounded in specific and articulable facts."
> <u>United States v. Espinoza</u>, 490 F.3d 41, 47 (1st Cir.
> 2007)(quoting <u>United States v. Hensley</u>, 469 U.S. 221,
> 229, 105 S.Ct. 675 ... (1985)).  The objective component
> requires courts to "focus not on what the officer himself
> believed but, rather, on what a reasonable officer in his
> position would have thought."  <u>Id.</u>

<u>Schubert</u>, 589 F.3d at 501 (1st Cir. 2009); <u>see also</u> <u>Klaucke v.</u>
<u>Daly</u>, ___ F.3d ___, 2010 WL 431876, at *3-4 (1st Cir. Feb. 9,
2010).

Viewing the evidence in the light most favorable to
Plaintiff and applying the above law, I find that Silva's action
in ordering the men down from the porch was not justified
because, as reflected in his trial testimony, he did not have
reasonable suspicion supported by articulable facts that the men
were engaged in any criminal activity.  Silva admitted that when
he approached Plaintiff and his friends they were not doing
anything, Tr. T. at 15, that they were "[j]ust standing there,"
<u>id.</u>, and that they were not engaged in any of the illegal
activities (prostitution, loitering, drug dealing) about which
the police had received complaints, <u>see id.</u> at 5, 17-18.  Thus,
the stop was not justified at its inception.

Even if Silva did not order the men down from the porch but
merely asked them to do so in order to converse with them, <u>see</u>

15

Klaucke, 2010 WL 431876, at *3 ("Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment.  Such police engagements need not find a basis in any articulable suspicion."), the encounter clearly rose to the level of a Terry stop when Silva began searching Plaintiff's person.  At that point, accepting Plaintiff's testimony as true, he was unquestionably being detained.  Plaintiff testified that Silva put his hand in Plaintiff's pockets, see Tr. T. at 53, and searched inside Plaintiff's coat, id. 46, 53, and that this happened before Plaintiff stated that he was going to call his lawyer, id. at 47. Plaintiff's testimony on the intrusiveness of the search was corroborated by that of his girlfriend, Delores Reyes.  See id. at 31.  The fact that Plaintiff could not produce any identification when asked by Silva, see Dep. T. at 59, did not provide a basis for Silva to put his hands inside of Plaintiff's pockets.  Indeed, it is doubtful that Plaintiff's inability to produce identification even provided a basis for a pat-down of the outside of his person.  See United States v. Martins, 413 F.3d 139, 149 (1st Cir. 2005)(noting "doctrine that permits a police officer to pat down an individual for concealed weapons upon a reasonable suspicion that the individual might be armed, provided that the officer's suspicion is grounded in 'specific and articulable facts.'")(quoting Maryland v. Buie, 494 U.S. 325, 331-32, 110 S.Ct. 1093 (1990)(quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968))); United States v. Scott, 270 F.3d 30, 42 (1st Cir. 2001)("[To conduct a] self-protective search for weapons, [an officer] must be able to point to particular facts from which he reasonably inferred that the individual [searched] was armed and dangerous.")(alterations in original); see also Estrada v. Rhode Island, ___ F.3d ___, 2010 WL 376978, at *7 (1st Cir. Feb. 4, 2010)("The inquiry of whether an officer has

reasonable suspicion to conduct a pat-down search requires a consideration of 'the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion.")(quoting <u>United States v. McKoy</u>, 428 F.3d 38, 39 (1st Cir. 2005)).  Accordingly, I find that the <u>Terry</u> stop, detention, and search of Plaintiff (prior to his arrest) was not justified.

Defendants appear to argue that Silva and Colt were justified in stopping and detaining Plaintiff because they had "received information from a confidential informant that the plaintiff had been involved in an earlier house break and would be arriving in a certain vehicle with the booty from that break." Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defendants' Mem.") at 5; <u>see also</u> Defendant Ricardo M. Silva's Answers to Plaintiff's Interrogatories ("Silva's Answers"), Ans. No. 12; Colt's Answers, Ans. No. 18.  However, the claim that Silva and Colt had received information from a confidential informant was made for the first time in their responses to Plaintiff's interrogatories.  There is no mention of an informant in the police report which the officers filed, <u>see</u> Plaintiff's Exhibits at 4, and, most significantly, the claim is at odds with Silva's trial testimony that he and Colt approached Plaintiff and his friends based only on the general complaints from residents of loitering, prostitution, and drug activity in the area.  <u>See</u> Tr. T. at 4-6.  Silva admitted that Plaintiff and his friends were engaged in none of these activities.  <u>See</u> <u>id.</u> at 17-18.  Given these facts, a jury could reasonably find that Defendants' claim that Plaintiff and his friends were questioned and detained because of information provided by a confidential informant is a recent fabrication intended to protect Silva and Colt from civil liability after the criminal charge against Plaintiff was dismissed and he filed this lawsuit.

For the same reason, Defendants are not entitled to summary judgment based on qualified immunity with respect to Plaintiff's claims that he was unlawfully stopped, detained and searched. Estrada, 2010 WL 376978, at *4 ("The doctrine of qualified immunity protects government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'")(quoting Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 526 (1st Cir. 2009)). Accepting Plaintiff's version of what transpired, no reasonable police officer could have believed that he could lawfully order Plaintiff down from the porch, detain him, search the inside of his pockets by inserting his hands into the pockets, and prevent Plaintiff from using his phone.[24]

Accordingly, to the extent that Silva seeks summary judgment with respect to Plaintiff's claim based on an illegal search of Plaintiff's person[25] prior to Plaintiff being arrested, the

_____

[24] Defendants contend that Silva could lawfully prevent Plaintiff from using his phone in order to maintain the status quo. See United States v. Hensley, 469 U.S. 221, 683-84, 105 S.Ct. 675 (1985)(holding that during investigatory stop police officers are "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo"); United States v. Albert, 579 F.3d 1188, 1193 (10th Cir. 2009)(same); United States v. Alvarez, 899 F.2d 833, 838 (9th Cir. 1990)("The Supreme Court has permitted limited intrusions of a suspect's liberty during a Terry stop to protect the officer's safety; a police officer may take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed."). However, this justification disappears if the Terry stop was not justified, and the Court has determined, viewing the evidence in the light most favorable to Plaintiff, that it was not.

[25] Plaintiff in his statement of undisputed facts asserts that his car was searched. See Plaintiff's Statement[] of Undisputed Facts (Doc. #81). However, the Amended Complaint makes no mention of a search of Plaintiff's automobile. Accordingly, the Court rules that any claim based on an alleged illegal search of Plaintiff's car is not part of this action.

18

motion should be denied.  I so recommend.

### b.  Arrest

Plaintiff testified that when he pulled the phone back, Silva "cowered," Tr. T. at 47, 48, and "kind of f[e]ll back," id. at 47; see also id. at 54 ("He cowered, that's what happened, he was embarrassed because he cowered.").  Significantly, Plaintiff admits that Silva "cowered" because he thought Plaintiff was going to hit him.  Id. at 54; see also id. at 48-49.  Thus, Plaintiff's sudden movement placed Silva in fear and gave Silva probable cause to believe that Plaintiff had assaulted him.  See Picard v. Barry Pontiac-Buick, Inc., 654 A.2d 690, 694 (R.I. 1995)("An assault is a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm."); id. (explaining that "[a]ssault and battery are separate acts, usually arising from the same transaction, each having independent significance"); see also Broadley v. State, 939 A.2d 1016, 1021 (R.I. 2008)(explaining that an assault "is different from a battery, which is defined as an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another, thereby generally resulting in the consummation of the assault")(internal quotation marks omitted).  Given the circumstances, Silva's apprehension of imminent bodily harm was reasonable at that point.  See Picard, 654 A.2d at 694 (holding that because the apprehension of imminent bodily harm was reasonable a prima facie case of assault was established); see also Hennessey v. Pyne, 694 A.2d 691, 696 (R.I. 1997)("It is a plaintiff's apprehension of injury [which apprehension must be of the type normally aroused in the mind of a reasonable person] which renders a defendant's act compensable.")(alteration in original).

Plaintiff asserts that Silva testified that "the plaintiff

had his hands DOWN by his side at all times," Plaintiff's Motion for Summary Judgment at 10[26] (citing Tr. T. at 22), and presumably contends that this statement demonstrates that Silva could not reasonably have been placed in fear of being struck. However, Plaintiff overstates Silva's testimony.  See Tr. T. at 22.  Read in context, see id. at 21-22, it is not clear whether Silva meant by his answer that Plaintiff was holding the phone "[b]y his side," id. at 22, when Silva reached for it, see id. at 21 ("he was holding his cell phone"), or after Plaintiff pulled it back, id. at 22.  Moreover, when asked directly whether Plaintiff was holding the phone up or down, Silva stated that he did not remember.  Id. at 22.  Thus, the record does not support Plaintiff's claim that Silva agreed that Plaintiff's hands were down at his sides "at all times."  Plaintiff's Motion for Summary Judgment at 10.  To the contrary, Silva testified that when Plaintiff "pulled the phone away, he, with his right arm, closed his fist and went to take a swing."  Tr. T. at 11.  Because Silva had probable cause to believe that Plaintiff had assaulted him, his arrest of Plaintiff was reasonable under the Fourth Amendment.  See Devenpeck v. Alford, 543 U.S. 146, 152, 125 S.Ct. 588 (2004)("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.");

As the First Circuit has explained:

An arrest is lawful if the officer has "probable cause." Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694 ... (1985).  A police officer has probable cause when, at the time of the arrest, the "facts and circumstances within

---

[26] Plaintiff's numbering of the pages of Plaintiff's Motion for Summary Judgment is confusing.  As the entire document consists of nineteen pages, the Court has renumbered the pages 1 to 19 and cites to Plaintiff's Motion using this renumbering.

the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S.Ct. 2627 ... (1979); see also Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223 ... (1964); Acosta v. Ames Dep't Stores, 386 F.3d 5, 9 (1st Cir. 2004); Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992); United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987).   In determining whether the officer had probable cause, we must view the circumstances from the perspective of a reasonable person in the position of the officer. Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 255 (1st Cir. 1996)(citing Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317 ... (1983)).  Probable cause requires only a probability that the defendant committed the crime. See Hill v. California, 401 U.S. 797, 804, 91 S.Ct. 1106 ... (1971)("But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time."); see also Wilson v. Russo, 212 F.3d 781, 789 (3rd Cir. 2000)("Probable cause [to arrest] exists if there is a fair probability that the person committed the crime at issue." (internal quotation marks and citation omitted)).  "The test for probable cause does not require the officers' conclusion to be ironclad, or even highly probable.   Their conclusion that probable cause exists need only be reasonable." Acosta, 386 F.3d at 11 (internal quotation marks and citation omitted).

The question of probable cause, like the question of reasonable suspicion, is an objective inquiry.   See Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004).   The "actual motive or thought process of the officer is not plumbed." Id. (citing Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769 ... (1996)).  The only relevant facts are those known to the officer.  When these facts are in reasonable dispute, the fact-finder must resolve the dispute. Bolton, 367 F.3d at 7.  However, when the underlying facts claimed to support probable cause are not in dispute, whether those "raw facts" constitute probable cause is an issue of law that we must determine de novo. Id. at 8 (citing Ornelas v. United States, 517 U.S. 690, 696-97, 116 S.Ct. 1657 ... (1996)).

<u>Holder v. Town Of Sandown</u>, 585 F.3d 500, 504 (1st Cir. 2009).

Applying the above law, the Court views the circumstances from the perspective of a reasonable person in the position of Silva.  Doing so, the Court concludes that Plaintiff's sudden and unexpected movement placed Silva in fear of an imminent bodily assault by Plaintiff.  Plaintiff himself describes Silva as cowering in response to Plaintiff's pulling the cell phone back, Tr. T. 47-48, 54, and admits that Silva believed (albeit mistakenly) that Plaintiff was preparing to strike him, <u>id.</u> at 54.  Silva was not required to accept Plaintiff's denial that this was his intention.[27]  See <u>Holder</u>, 585 F.3d at 505 ("we already have rejected the proposition that a police officer has a standing obligation to investigate potential defenses or resolve conflicting accounts prior to making an arrest.").

Plaintiff argues that it was Silva's attempt to take Plaintiff's phone from him which caused Plaintiff to pull it back and that, since Silva had no lawful basis to prevent Plaintiff from calling his attorney, Silva should not be allowed to rely upon Plaintiff's movement as constituting probable cause to arrest him.  Plaintiff cites <u>Dyson v. City of Pawtucket</u>, 670 A.2d 233 (R.I. 1996), in support of this argument.  In <u>Dyson</u>, a Pawtucket police officer, Clary, stopped a car, and asked the male driver for his license and registration.[28]  <u>Id.</u> at 235.  The driver stated that he had neither document.  <u>Id.</u>  Clary then requested identification from the three passengers, Dyson, her sister, and another male.  <u>Id.</u>  Dyson gave the officer her license and identification.  <u>Id.</u>  Shortly thereafter, two more

---

[27] Plaintiff testified that he told Silva that he was not trying to hit him. Tr. T. at 48 ("[H]e sort of like cowered and, and he said you trying to and I said no, I ain't trying to hit you, I just grab my phone back ....").

[28] The reason the officer stopped the car is not stated in the opinion.  See <u>Dyson v. City of Pawtucket</u>, 670 A.2d 233 (R.I. 1996).

police officers, Rousseau and White, arrived at the scene to provide backup.  Id.  Dyson testified that Rousseau swore at her and ordered her out of the car.  Id.  The opinion continues:

> She got out of the car, walked a short distance from the car, and sat down on the front steps of a house.  She said that she was not told that she was under arrest. She and her sister then went to a nearby phone booth to report Rousseau to his superiors for his improper conduct.  Dyson said that she did not flee or run to the phone booth.  She did not hear anyone telling her not to leave the area or warning her to stop.  While she was at the phone booth, Rousseau arrived and asked her what she was doing. She told Rousseau that she was calling the police. According to plaintiff, Rousseau grabbed her, placed her hands behind her back, and took her to the police car, where he "smashed" her head against the trunk approximately five times.  Dyson was then put into the police car and taken to the police station.

> ....

> Rousseau testified that he accompanied White in the backup unit.  He said that he approached the vehicle and told the driver to get out of the car.  The other male passenger also got out of the car. After conducting a pat-down search of the driver and the other male passenger, Rousseau instructed them to stay by the car. He then told Dyson and her sister to get out of the car but acknowledged that neither had done anything wrong. He said that he "probably" had used vulgar language.  He told the women to sit down near a wall, even though he had no reason to place them under arrest at the time. He next heard someone yelling, "Where are you going?" and noticed Dyson and her sister leaving the area.  Both White and Rousseau pursued both women to a nearby phone booth.  After pulling up to the phone booth, Rousseau ordered Dyson to put the phone down.  He said he thought Dyson was calling either her father or the police department.  He said that he grabbed Dyson by the shoulders to prevent her from moving and assisted her with putting the phone down.  According to Rousseau, Dyson resisted putting the phone down and attempted to strike him.  He claimed that when he tried to put her into the patrol car, the momentum generated by her attempt to hit him sent her toward the car and caused her to smash her face on the car.  After the plaintiff hit

the car, Rousseau arrested her for disorderly conduct and handcuffed her.

Id.

Dyson was found guilty of disorderly conduct in the state district court.  Id. at 235.  However, she sued Rousseau, White, and the City of Pawtucket for assault and battery, false arrest, and violation of her constitutional rights.  Id. at 234.  After a superior court jury returned verdicts in her favor on these claims, Rousseau, White, and the city appealed to the Rhode Island Supreme Court.  See id.  Among other arguments, they contended that the guilty finding on the disorderly conduct charge precluded a subsequent civil action for false arrest on the same charge.  Id. at 238.  As support for their contention, they drew an analogy to the rule in malicious prosecution cases that "[p]roof of a conviction resulting from an arrest is conclusive evidence of probable cause in malicious-prosecution cases."  Id. at 239 (citing Hull v. Sprague, 49 A. 697, 697 (R.I. 1901)).

The Rhode Island Supreme Court disagreed with the officers' contentions and declined to extend the "conclusiveness doctrine" in malicious prosecution cases to Dyson's claim for false arrest. Id.  The court explained that the tort of malicious prosecution requires that "the party instituting the proceedings which resulted in the arrest ha[ve] acted with 'malice and want of probable cause,'" id. (quoting Moody v. McElroy, 513 A.2d 5, 8 (R.I. 1986)(quoting Powers v. Carvalho, 368 A.2d 1242, 1246 (R.I. 1977))), and that proof of a conviction resulting from an arrest is conclusive evidence of probable cause in malicious prosecution cases, id.  In contrast, the "[g]uilt or innocence of the underlying charge * * * is not relevant to the determination of whether the arresting officer committed a false imprisonment." Id. (citing Moody v. McElroy, 513 A.2d at 10 (alteration in

24

original).  After making this distinction, the <u>Dyson</u> court
stated:

> In the instant case Rousseau provoked Dyson's disorderly
> behavior when he arrested her without probable cause as
> she was attempting to make a phone call.  He cannot now
> be allowed to use her subsequent conviction on the charge
> of disorderly conduct to avoid liability for false
> arrest.

<u>Id.</u>

Plaintiff zeroes in on the above language and argues that
<u>Dyson</u> precludes summary judgment on his claims against Silva
based on actions taken by Silva after Plaintiff pulled the phone
back.  However, this Court has not adopted the argument which
<u>Dyson</u> rejected.  The Court does not base its finding that Silva
had probable cause to arrest Plaintiff on Plaintiff's district
court conviction for disorderly conduct.[29]  Rather, that finding
is based on Plaintiff's own admission that his actions placed
Silva in fear of being struck.  Thus, Silva arrested Plaintiff
not because Plaintiff attempted to make a telephone call, but
because Silva reasonably believed that Plaintiff had attempted to
hit him and this gave probable cause for the arrest.  In
contrast, in <u>Dyson</u> the state supreme court found that Rousseau
had no probable cause to arrest Dyson.  <u>Id.</u> at 239 ("Rousseau ...
arrested her without probable cause as she was attempting to make
a phone call."); <u>see also</u> <u>id.</u> at 235 (stating that when Dyson

---

[29] Defendants appear to make this argument.  <u>See</u> Defendants' Mem.
at 3-4 (citing district court judge's "finding of guilt").  However,
the Court specifically rejects it.  Plaintiff appealed the district
court's guilty finding to the superior court pursuant to R.I. Gen.
Laws § 12-22-1, and this action vacated the conviction.  <u>See</u> <u>State v.
Diggins</u>, 185 A.2d 300, 301 (R.I. 1962)("By his appeal, the defendant,
exercising his right under the statute, asked for, and was granted a
trial de novo on the facts and the law in the superior court.").
Thus, this Court's finding that Silva had probable cause to arrest
Plaintiff is in no way based on the fact that Plaintiff was found
guilty of disorderly conduct in the state district court.

told Rousseau that she was calling the police, he "grabbed her, placed her hands behind her back, and took her to the police car ....").  Thus, the <u>Dyson</u> court found that Rousseau lacked probable cause to arrest Dyson, and it declined to allow Rousseau to manufacture probable cause based on Dyson's actions after Rousseau commenced his unlawful arrest and assault of her.  Here Silva unquestionably had probable cause to arrest Plaintiff after Plaintiff pulled the phone back and placed Silva in fear.

Accordingly, the Court finds that Silva had probable cause to arrest Plaintiff for assault.  Silva's motion for summary judgment on all claims based on Plaintiff's contention that he was illegally arrested should be granted.  I so recommend.

### c.  Excessive Force/Assault and Battery

Excessive force claims arising out of arrests are analyzed under the Fourth Amendment's protection against unreasonable seizures.  <u>Bastien v. Goddard</u>, 279 F.3d 10, 14 (1st Cir. 2002). Plaintiff:

> must demonstrate that the police defendant's actions were not objectively reasonable, viewed in light of the facts and the circumstances confronting him and without regard to his underlying intent or motivation.

<u>Id.</u> (quoting <u>Alexis v. McDonald's Rests. of Mass.</u>, 67 F.3d 341, 352 (1st Cir. 1995)).  "The relevant circumstances include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  <u>Id.</u> (internal quotation marks omitted).

A serious injury is not a prerequisite to recovery.  <u>Id.</u>; <u>cf.</u> <u>Wilkins v. Gaddy</u>, ___ U.S. ___, ___ S.Ct.___, No. 08-10914, 2010 WL 596513, at *1 (Feb. 22, 2010)("[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious

injury.")(quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 4, 112 S.Ct.
995 (1992))(second alteration in original); <u>id.</u> (noting "<u>Hudson</u>'s
direction to decide excessive force claims based on the nature of
the force rather than the extent of the injury").   However, this
is not to say that the absence of serious injury is irrelevant to
the determination of whether Silva's actions were objectively
reasonable.   <u>Cf.</u> <u>Wilkins</u>, 2010 WL 596513, at *2 (stating that the
absence of serious injury is not irrelevant to the Eighth
Amendment inquiry regarding whether the use of excessive physical
force constitutes cruel and unusual punishment).   The extent of
the injury suffered by Plaintiff is one factor that may suggest
whether the use of force could plausibly have been thought
necessary in a particular situation.   <u>Id.</u>   The extent of the
injury may also provide some indication of the amount of force
applied.   <u>Id.</u>; <u>see also</u> <u>id.</u> (explaining that the "core judicial
inquiry" in excessive force claim under the Eighth Amendment is
not "whether a certain quantum of injury was sustained, but
rather whether force was applied in a good-faith effort to
maintain or restore discipline, or maliciously and sadistically
to cause harm")(internal quotation marks omitted).

     Plaintiff testified at his deposition that he suffered
"[m]inor bruises, no cuts," Dep. T. at 28, as a result of being
arrested.   He did not seek any medical treatment, and he felt the
bruises for "[a]bout a day and a half, maybe two days."[30]   <u>Id.</u> at

---

[30] Plaintiff's deposition testimony is illuminating with regard to
the degree of his injuries.   Describing his arrest, Plaintiff
recounted that:

> [Silva] went for the phone, right, and then he said, okay, you
> under arrest, he grabbed me by here (indicating), and he put
> me in the van.  I'm, like, what, are you kidding me? For what?
> Assaulting a police officer.  I said I didn't even touch you,
> what are you talking about, assaulting a police officer, so
> that's about it.  **What really hurt me is that I couldn't watch
> that game.**

27

29.

Here Silva's actions in grabbing Plaintiff and throwing[31] him against the van immediately followed Plaintiff's action of pulling his phone away.  Silva interpreted Plaintiff's movement as preparatory to striking him.  Given this belief, Silva could reasonably have believed that it was necessary to take Plaintiff immediately into custody and to do so in a manner which would prevent Plaintiff from throwing the blow which Silva perceived was about to fall.  Given these facts, the Court finds that no reasonable jury could find that Silva's actions were objectively unreasonable.  Accordingly, to the extent that Plaintiff's claims are based on Silva using excessive force in effecting Plaintiff's arrest, such claims cannot succeed.

Plaintiff's claim for assault and battery fails for the same reason.  See Tessier v. LaNois, 198 A.2d 142, 143 (R.I. 1964)("a police officer may use such force as is necessary to effectuate the arrest"); see also State v. Hurteau, 810 A.2d 222, 225 (R.I. 2002)("It is a well-developed principle that in making an arrest an officer has the right to use the amount of force that is necessary to properly perform his duty."); State v. Gelinas, 417 A.2d 1381, 1385 (R.I. 1980)("It is a well-accepted principle that in effecting an arrest an officer has the right to use such force as he may reasonably believe necessary in order to discharge properly his duty.").  Accordingly, Silva is entitled to summary judgment as to Plaintiff's claims of excessive force and assault and battery.  I so recommend.

### d.  Removal of Phone

To the extent that Plaintiff's claim is based on Silva's

---

Dep. T. at 62 (bold added).

[31] See n.22.

action in trying to take the phone away from Plaintiff prior to Silva being placed in fear, the motion should be denied.[32]  <u>See United States v. Deitz</u>, 577 F.3d 672, 687 (6th Cir. 2009)("The Fourth Amendment protects a person's right to his personal property without interference from the police absent consent or reasonable suspicion or probable cause that a crime has been, will be, or is being committed.").  To the extent that Plaintiff's claim is based on Silva removing the phone from Plaintiff's possession after Silva was placed in fear of imminent bodily harm, such claim fails.[33]  Silva was clearly authorized to take the phone from Plaintiff as it could have been used as a weapon or its removal was otherwise necessary in order to handcuff and place him under arrest.

To the extent that Plaintiff's claim is based on the contention that after Silva took the phone from him, Silva seized it and took custody of the phone, such claim fails because Plaintiff has pointed to nothing in the record which contradicts Silva's testimony that he put the phone "down, on, ah, top of the van, but I didn't seize it-seize it.  I didn't put it into property or anything like that."  <u>See</u> Tr. T. at 20.  Accordingly, Silva is entitled to summary judgment on claims relating to the removal of the phone from Plaintiff after Silva was placed in fear.  I so recommend.

---

[32] <u>See</u> n.24.

[33] Admittedly, the period of time between Silva attempting to take the phone and his being placed in fear is extremely brief (probably only one or two seconds).  Nevertheless, viewing the evidence in the light most favorable to Plaintiff, Silva had no lawful basis to take the phone from Plaintiff prior to being placed in fear of imminent bodily harm, and Silva testified that he attempted to take the phone from Plaintiff prior to Plaintiff pulling the phone away.  <u>See</u> Tr. T. at 11, 22 (testifying that he attempted to take the phone and that Plaintiff pulled it away).

### e. Strip Search

Although Plaintiff alleged in the Amended Complaint that he "was subjected to a strip search and private parts cav[i]ties search," Amended Complaint ¶ 8, at the police station, Plaintiff acknowledges that he "was not stripped searched by the defendants." Defendants' Statement of Undisputed Facts (Doc. #71) ("DSUF") ¶ 19; <u>see also</u> Plaintiff's Objection to Defendants' Statement of Undisputed Facts at 2 (not disputing DSUF ¶ 19). Accordingly, Silva is entitled to summary judgment as to this claim. I so recommend.

Although Plaintiff's failure to dispute DSUF ¶ 19 by itself entitles Silva to summary judgment on this claim, even if Plaintiff had disputed DSUF ¶ 19 Silva would still be entitled to summary judgment. There is no evidence that Silva conducted a strip search or that he was in any way responsible for a strip search if one occurred at the police station. Silva's only apparent connection with such a search would be that he arrested Plaintiff and that this resulted in Plaintiff being taken to the police station where the search occurred. This is an insufficient basis upon which to impose liability on Silva. <u>See Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 922 (9th Cir. 2001)(finding arresting officers not liable for any constitutional injury that may have resulted from a strip search where plaintiff did not allege that they conducted, authorized, or knew about such search); <u>Thompson v. City of New York</u>, 603 F.Supp.2d 650, 659 (S.D.N.Y. 2009)(granting summary judgment where record contained no evidence that any of the individual defendants personally caused plaintiff to be strip searched); <u>Caidor v. Harrington</u>, No. 5:05-CV-0297 (GTS/GJD), 2009 WL 174958, at *4 (N.D.N.Y. Jan. 26, 2009)("It bears noting that an officer does not become liable to an individual for an unlawful strip search simply because the strip search was conducted after the

30

officer arrested the individual (and authored an arrest report and/or incident report).”); see also Kostka v. Hogg, 560 F.2d 37, 40 (1st Cir. 1977)(explaining that where an individual had no personal role in deprivation of constitutional rights, he may not be held liable under 42 U.S.C. § 1983).  Accordingly, even if Plaintiff's failure to dispute DSUF ¶ 19 was inadvertent, Silva is still entitled to summary judgment on this claim as there is no evidence that he was in any way involved in a strip search of Plaintiff.  I so recommend.

### f.   Allegedly False Report and Testimony

Plaintiff's claims based on Silva allegedly filing a false police report and testifying falsely at trial are premised on Plaintiff's contention that Silva had no basis to arrest him and that the false statements were made to conceal the lack of probable cause for Plaintiff's arrest.  However, Plaintiff's acknowledgment that Silva believed that Plaintiff was trying to hit him, see Tr. T. at 54, undermines this contention.  A police report and testimony which is consistent with Silva's belief that Plaintiff was going to strike him can hardly be deemed false, at least not false to the degree that would support a finding of liability.

The statements in the police report and in Silva's testimony with respect to what transpired after Plaintiff pulled the phone back are not significantly different from what the Court has already determined a person in Silva's position could have reasonably perceived.  The police report states in relevant part:

> Police then asked the subject to put the phone down at
> which point he failed to comply and Police reached for
> the phone and he stated "No" and with his right arm made
> a swing motion with a closed fist towards Ptlm. Silva.
> Police immediately restrained [Plaintiff] and placed him
> into custody.

Plaintiff's Exhibits at 4.

31

Silva's trial testimony was similar to the above:

Q.   What did [Plaintiff] do?

A.   He pulled the phone away from me.

Q.   And was that the extent of your interaction with, with [Plaintiff]?

A.   No.  When he pulled the phone away, he, with his right arm, closed his fist and went to take a swing.

Q.   When you say went to take a swing, what, exactly, did [Plaintiff] do?

A.   He made a swing-like motion.

Q.   Swing-like motion?  In the air?  Where?

A.   Ah, would you like me to demonstrate?

Q.   Why not.

A.   Ah, as he had his phone in his left hand, I went to reach for it, he pulled away, took his arm and went like this.  He stopped.

Q.   He went like that where, (inaudible) in the air?

A.   Ah, towards, in my direction.

Q.   In your direction?  Okay.  And you said he stopped?

A.   Yes.

Q.   How close did his fist get to you?

A.   Ah, approximately maybe a foot and-a-half, two feet.[34]  Yeah, it happened really quick.

_____

    [34] On cross-examination, Silva testified that he was "not exactly sure," Tr. T. at 23, of the distance and allowed that it could have been "[m]aybe a little less," id., than four feet.

32

> Q.   What, if anything, did you do after [Plaintiff]
>      went to, as you said, take a swing?
>
> A.   I immediately placed him in, ah, handcuffs for
>      my safety.

Tr. T. at 11-12.

Given the circumstances, i.e., that it was nighttime, that
Plaintiff pulled the phone back suddenly, and that Plaintiff
acknowledges that Silva believed that Plaintiff was about to
strike him, no reasonable jury could find that the statements in
question were false to the degree that they provide a basis for
imposing liability on Silva.  To the extent that Plaintiff may
contend that the fact Silva described Plaintiff as having a
closed fist and making a swing-like gesture in Silva's direction
(which acts Plaintiff denies doing), the Court is unpersuaded
that these differences (between Plaintiff's and Silva's versions
of events) are sufficiently significant to allow a jury to find
that Silva's statements violated Plaintiff's constitutional
rights or any state law claim based on such statements.[35]
Accordingly, Plaintiff's claims based on Silva allegedly filing a
police false report and testifying falsely should be rejected.  I
so recommend.

### g.  Malicious Prosecution/Abuse of Process[36]

To recover damages for malicious prosecution, a party must
prove: 1) defendants initiated a prior criminal proceeding

---

[35] The Court would take a different view of this issue if Silva
had stated in his report or testified that Plaintiff had actually
struck him.  A conflict of this magnitude as to what transpired could
not reasonably be explained by a difference in perception.

[36] It bears noting that both of these torts are disfavored causes
of action.  Fiorenzano v. Lima, 982 A.2d 585, 590 n.9 (R.I. 2009);
Palazzo v. Alves, 944 A.2d 144, 153 (R.I. 2008)("the tort of malicious
prosecution ... is ... a disfavored cause of action since it 'tend[s]
to deter the prosecution of crimes and/or chill free access to the
courts")(third alteration in original).

33

against him, 2) they did not have probable cause to initiate such
a proceeding, 3) the proceeding was maliciously instituted, and
4) it terminated in the plaintiff's favor.  Hill v. Rhode Island
State Employees' Retirement Bd., 935 A.2d 608, 613 (R.I. 2007)
(citing Solitro v. Moffatt, 523 A.2d 858, 861-62 (R.I. 1987)).
The Court has already determined that Silva had probable cause to
arrest Plaintiff for assault.  See id. ("Whether defendants in a
malicious-prosecution action had probable cause to initiate a
criminal action is a question of law to be determined by the
court.").  In addition, Plaintiff has pointed to no evidence in
the record which would permit a jury to find that the prosecution
was maliciously instituted.  See id. (stating that "the plaintiff
must establish 'clear proof' of malice and lack of probable
cause")(quoting Soares v. Ann & Hope of Rhode Island, Inc., 637
A.2d 339, 345 (R.I. 1994)).  Plaintiff's apparent theory that the
prosecution was instituted as a means of covering up his
allegedly unlawful arrest is negated by the Court's determination
that probable cause to arrest Plaintiff existed.  Because Silva
had probable cause to arrest Plaintiff, he cannot succeed on his
malicious prosecution claim.  See Meehan v. Town of Plymouth, 167
F.3d 85, 91-92 (1st Cir. 1999)("Because there was probable cause
to believe that [plaintiff] was involved in drug trafficking at
the time he was charged with that crime, the district court
properly granted summary judgment against both his state and
federal malicious prosecution claims.").  Therefore, Silva is
entitled to summary judgment as to Plaintiff's malicious
prosecution claim.  I so recommend.

     To prevail on an abuse of process claim, a plaintiff must
prove: 1) that the defendant instituted proceedings or process
against the plaintiff and 2) that the defendant used these
proceedings for an ulterior or wrongful purpose that the
proceedings were not designed to accomplish.  Fiorenzano v. Lima

34

982 A.2d 585, 590 (R.I. 2009).

> The improper purpose usually takes the form of coercion
> to obtain a collateral advantage, not properly involved
> in the proceedings itself, such as the surrender of
> property or the payment of money, by the use of process
> as a threat or a club. There is, in other words, a form
> of extortion.

Id.; see also Butera v. Boucher, 798 A.2d 340, 354 (R.I. 2002)
("The gist of an abuse-of-process claim is the misuse of legal
process to obtain an advantage, 'not properly involved in the
proceeding itself * * *. [However], even a pure spite motive is
not sufficient where process is used only to accomplish the
result for which it was created.'")(quoting W. Page Keeton,
Prosser & Keeton on the Law of Torts § 121 at 897 (5th ed.
1984))(alterations in original)(italics eliminated). There is no
evidence in the record that Silva used the criminal proceeding
against Plaintiff for an ulterior or wrongful purpose. Rather,
it is plain that Silva charged Plaintiff with assault because he
believed Plaintiff had assaulted him (i.e., placed Silva in fear
of imminent bodily harm). Accordingly, Silva is entitled to
summary judgment on Plaintiff's abuse of process claim. I so
recommend.

### 2. Colt

As to Colt, Defendants' motion should be granted as to all
claims. There is no evidence that Colt participated in the
questioning and search of Plaintiff. Plaintiff testified that
"Colt was behind with his bike, so he let Silva do everything."
Dep. T. at 58. Plaintiff further testified that it was Silva
alone who arrested him, id. at 65, and Colt was "just doing
nothing, saying nothing, doing nothing," id. To the extent that
Colt was present during the initial stop and detention of
Plaintiff, his involvement was insufficient to allow a finding of
liability.

Plaintiff's argument that because Colt "acted as cover," Silva's Answers, Ans. No. 2, and "participated in detaining the plaintiff," Colt's Answers, Ans. No. 3, he can be held liable for the violations claimed by Plaintiff is rejected. Colt's mere presence when Silva detained, questioned, searched, and arrested Plaintiff is an insufficient basis on which to impose liability for these acts. See Kostka, 560 F.2d at 39 (stating that "only persons who were directly involved in the wrongdoing may be held liable" for damages under 42 U.S.C. § 1983). Furthermore, with respect to Plaintiff's arrest, the Court has already determined that the arrest was lawful and that Silva is entitled to summary judgment as to all claims based on acts occurring thereafter. Therefore, even if Colt assisted in the arrest, such assistance was lawful, and Colt is entitled to summary judgment as to all claims based on acts occurring after Plaintiff pulled the phone back for the same reasons that Silva is entitled to summary judgment as to those claims.

### 3.   **Esserman**

Plaintiff claims that Esserman is vicariously liable based on the doctrine of respondeat superior. See Amended Complaint ¶ 12; see also Plaintiff's Motion for Summary Judgment at 12. However, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1948 (2009); see also Aponte Matos v. Toledo Dávila, 135 F.3d 182, 192 (1st Cir. 1998)("Supervisory liability under § 1983 'cannot be predicated on a respondeat theory, but only on the basis of the supervisor's own acts and omissions.'")(quoting Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997)).

With respect to supervisory liability, the First Circuit has recently explained that:

In the context of Section 1983 actions, supervisory

liability typically arises in one of two ways: either the supervisor may be a "primary violator or direct participant in the rights-violating incident," or liability may attach "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." Camilo- Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999). In the latter scenario ... the analysis focuses on "whether the supervisor's actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort." Id. In either case, the plaintiff in a Section 1983 action must show "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization," id., between the actor and the underlying violation.

Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009). Here Esserman was not a "primary violator or direct participant" in the incident giving rise to the instant lawsuit. Thus, supervisory liability may only attach if he supervised, trained, or hired a subordinate with deliberate indifference toward the possibility that deficient performance of the task may contribute to a civil rights violation. See id. In deciding this question, the analysis focuses on whether Esserman's actions displayed deliberate indifference towards the rights of third parties and have some causal connection to the subsequent tort. See id. Plaintiff must show "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization," id., between Esserman and the underlying violation, see id. There is no evidence in the record that Esserman supervised, trained, or hired Silva (other than indirectly through other subordinates). Even if Esserman had performed any of these actions directly, there is no evidence that he did so with deliberate indifference towards the rights of third parties and that this had some causal connection to the incident which gave rise to the instant lawsuit. In short,

Plaintiff has not shown any action or inaction by Esserman that
is affirmatively linked to the constitutional violations
allegedly committed by Silva.  See Aponte Matos, 135 F.3d at 192
(stating the "affirmative link must amount to supervisory
encouragement, condonation or acquiescence, or gross negligence
amounting to deliberate indifference")(internal quotation marks
omitted).

Accordingly, Esserman is entitled to summary judgment in his
favor.  I so recommend.

### 4.  City of Providence

Like supervisory liability, municipal liability is not
vicarious.  Estate of Bennett v. Wainwright, 548 F.3d 155, 177
(1st Cir. 2008).  Municipalities can be held liable only if
municipal employees commit unconstitutional acts and those
actions are shown to have been caused by a "policy or custom" of
the government.  Id. (quoting Martínez-Vélez v. Rey-Hernández,
506 F.3d 32, 41 (1st Cir. 2007)(citing Monell v. Dep't of Soc.
Servs., 436 U.S. 658, 694, 98 S.Ct. 2018 (1978))).  Such custom
"must be so well settled and widespread that the policymaking
officials of the municipality can be said to have either actual
or constructive knowledge of it yet did nothing to end the
practice."  Id. (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156
(1st Cir. 1989).  A plaintiff can establish the existence of an
official policy by showing that the alleged constitutional injury
was caused by a formal decision of a municipal legislative body,
or by a person with final policymaking authority.  Welch v.
Ciampa, 542 F.3d 927, 941 (1st Cir. 2008).

In the Amended Complaint Plaintiff alleges that Lieutenant
John Doe sent Silva and Colt to investigate wrongdoing in the
neighborhood "without the proper training ...."  Amended
Complaint ¶ 12.  In Plaintiff's Motion he states that "they were
sent out into the streets of the [C]ity of Providence by their

supervisor, Sgt. DeAndrade, on their own to 'aggressively' patrol the area." Plaintiff's Motion at 12 (purportedly quoting Tr. T. at 5).[37] Regardless of whether it was Sgt. DeAndrade or Lieutenant John Doe who directed Silva and Colt to patrol the neighborhood, this falls far short of establishing that the City had a policy or custom regarding the patrolling which resulted in the unconstitutional acts. In addition, neither a lieutenant nor a sergeant is a person with final policymaking authority. There is no evidence in the record that Plaintiff's injury (which the Court has found is limited to the unjustified stop, detention, search, and interference with phone use) was caused by a formal decision of the Providence City Council or of a municipal official with final policymaking authority.

Plaintiff claims that he has witnessed racial profiling by the Providence Police Department in his neighborhood, especially on Parade Street by the bicycle patrol unit on a "daily" basis. Plaintiff's Motion at 13. He states:

> They stop anyone who is either Black or Hispanic looking and search them even though Parade Street is also a Park & City Playground, for no reason what so ever. (The above statements are made under penalty of perjury pursuant to 28 U.S.C.A. 1746. Felipe Almonte). It is a proven fact that Providence Police has a custom of Racial Profiling People, see <u>Northeastern University Study on Racial Profiling</u> for the City of Providence ordered by the R.I. Governor.

<u>Id.</u>

Even accepting the above as constituting an affidavit from Plaintiff, it's insufficient to establish the existence of a

---

[37] Silva testified: "[W]e had gotten numerous complaints about loitering, prostitution, drugs, nar, narocotics activity in the area, so we were aggressively patrolling the area." Tr. T. at 5. It bears noting that Silva did not testify that Sgt. DeAndrade (or anyone else) had instructed him to "aggressively patrol the area" as Plaintiff asserts in his motion.

"policy or custom" of the City of Providence.  Plaintiff does not state whether his "daily" observations predate or postdate October 28, 2007.  He provides no explanation as to how he was able to determine that a particular stop and/or search was made "for no reason."  His assertion that it is a proven fact that the Providence Police have a custom of racial profiling is rejected as there is no such evidence in the present record.  There is no evidence in the record which supports his claim that Silva and Colt get a fifty dollar bonus from the City for each arrest which they make.  Accordingly, the City of Providence is entitled to summary judgment on all claims.  I so recommend.

### C.   Summary of Findings re Defendants

Silva's actions in calling Plaintiff and his friends down from the porch, questioning them, searching Plaintiff's person, and preventing Plaintiff from using his phone constituted a Terry stop which was not justified because Silva did not have a reasonable suspicion supported by articulable facts that the men were engaged in criminal activity.  Therefore, Silva is not entitled to summary judgment as to Plaintiff's claims which are based on these acts.  Silva is entitled to summary judgment as to all claims based on actions taken by Silva after Plaintiff pulled the phone back because at that point Silva had probable cause to arrest Plaintiff for assault.  Colt, Esserman, and the City of Providence are entitled to summary judgment on all claims.

## V.   Plaintiff's Motion for Summary Judgment

### A.   Facts in Light Most Favorable to Silva[38]

---

[38] The Court's discussion of Plaintiff's Motion for Summary Judgment is limited to the claims against Silva because the Court has determined that Colt, Esserman, and the City of Providence are entitled to summary judgment on all claims.  Consideration of the claims against Silva is further limited to those which survive Defendants' Motion for Summary Judgment, i.e., those based on Plaintiff's allegations that Silva unlawfully stopped him, searched his person, and prevented him from calling his attorney.

Silva approached Plaintiff because the police had received information from an informant that Plaintiff had been involved in a housebreak earlier in the day and that Plaintiff would be arriving at 85 Parade Street with stolen goods in his vehicle. Silva's Answers, Ans. No. 12; see also Colt's Answers, Ans. No. 18.  Silva and Colt observed Plaintiff "arrive[] in the vehicle, along with a second vehicle, both of which matched the description given to us by the informant."  Silva's Answers, Ans. No. 12; see also Colt's Answers, Ans. No. 18.[39]  They approached the four men, who were on the sidewalk.  Plaintiff's Exhibits at 4.  Silva questioned Plaintiff and the other men as to their business and identities.  Id.  Plaintiff did not have any identification on him.  See Silva's Answers, Ans. No. 12; see also Tr. T. at 9.  Plaintiff took out his cell phone, stating that he wanted to call someone to bring his identification to the scene.  Id.  Silva told Plaintiff that this was not necessary, not to make any calls at that moment, and to put the phone away. Id.  Silva told Plaintiff this "numerous times."  Tr. T. at 9; id. at 10 ("He said no numerous times after I told him numerous times to put the phone down.").  Plaintiff refused to do so, and Silva attempted to take the phone from his hands.  Silva's Answers, Ans. No. 12; see also Colt's Answers, Ans. No. 18.  At that point, Plaintiff pulled back and away from Silva, coiling his hand to the side and rear of his body.  Id.  Silva interpreted this movement as a threat and arrested Plaintiff. Id.  Both Silva and Colt maintain that Plaintiff was only subjected to a "Terry pat down" search prior to being arrested. Silva's Answers, Ans. No. 13; Colt's Answers, Ans. Nos. 10, 18,

---

[39] Colt's answer could be read as indicating that only one of the vehicles matched the description provided by the informant.  See Colt's Answers, Ans. No. 18.  However, consistent with its obligation to do so, the Court states the facts in the light most favorable to Silva.

19.

**B.  Law Re _Terry_ Stops and Searches**

    **1.  _Terry_ Stops**

An officer may conduct a brief investigatory stop when he or
she has a reasonable suspicion that criminal activity is afoot.
_McKoy_, 428 F.3d at 39 (1st Cir. 2005)(citing _Terry_, 392 U.S. at
30, 88 S.Ct. 1868); _see also_ _Schubert_, 589 F.3d at 501 ("When
conducting a _Terry_ stop, a police officer may briefly detain an
individual for questioning if the officer has 'reasonable
suspicion supported by articulable facts that criminal activity
"may be afoot."'")(quoting _Sokolow_, 490 U.S. at 7, 109 S.Ct.
1581).  "While no perfectly precise definition of reasonable
suspicion exists, it is well established that, in terms of the
continuum of knowledge, reasonable suspicion requires more than a
mere hunch but less than probable cause."  _United States v.
Wright_, 582 F.3d 199, 205 (1st Cir. 2009).  Reasonable suspicion
requires "'a particularized and objective basis' for suspecting
the person stopped of criminal activity."  _Id._ (quoting _Ornelas_,
517 U.S. at 696)(quoting _United States v. Cortez_, 449 U.S. 411,
417-18, 101 S.Ct. 690 (1981))).  However, a determination that
reasonable suspicion exists need not rule out the possibility of
innocent conduct.  _Id._

In determining whether a _Terry_ stop is justified, the
Court's inquiry involves two steps, first, "whether the officer's
action was justified at its inception," _Schubert_, 589 F.3d at
501, and second, "whether it was reasonably related in scope to
the circumstances which justified the interference in the first
place," _id._ (quoting _Terry_, 392 U.S. at 20).  The initial stop
must be rooted in "a particularized and objective basis" for
suspecting illegal conduct on the part of person stopped.  _Id._
(quoting _Wright_, 582 F.3d at 205 (quoting _Ornelas_, 517 U.S. at
696)).  The particularity requirement is satisfied by a finding

"grounded in specific and articulable facts."  Id. (quoting
Espinoza, 490 F.3d at 47 (quoting Hensley, 469 U.S. at 229, 105
S.Ct. 675)).  The objective component requires courts to "focus
not on what the officer himself believed but, rather, on what a
reasonable officer in his position would have thought."  Id.

### 2. **Terry** Searches

After a valid Terry stop, a pat-frisk for weapons is also
permissible where "the officer is justified in believing that the
person is armed and dangerous to the officer or others."  McKoy,
428 F.3d at 39 (quoting United States v. Romain, 393 F.3d 63, 71
(1st Cir. 2004)(quoting United States v. Shiavo, 29 F.3d 6, 8(1st
Cir. 1994)).  It is insufficient that the stop itself is valid;
there must be a separate analysis of whether the standard for
pat-frisks has been met.  Id.  To assess the legality of a
protective frisk, a court looks at the totality of the
circumstances to see if the officer had a particularized,
objective basis for his or her suspicion.  Id.

### 3. **Restrictions on Liberty During Terry Stop**

Limited intrusions on a suspect's liberty during a Terry
stop to protect the officer's safety are permissible.  Hensley,
469 U.S. at 235, 105 S.Ct. 675)(holding that during investigatory
stop police officers are "authorized to take such steps as were
reasonably necessary to protect their personal safety and to
maintain the status quo during the course of the stop"); United
States v. Rousseau, 257 F.3d 925, 929 (9th Cir. 2001)("The
Supreme Court and this court have permitted limited intrusions on
a suspect's liberty during a Terry stop to protect the officer's
safety ...."); see also United States v. Albert, 579 F.3d 1188,
1193 (10th Cir. 2009)("Since police officers should not be
required to take unnecessary risks in performing their duties,
they are authorized to take such steps as are reasonably
necessary to protect their personal safety and to maintain the

status quo during the course of [a <u>Terry</u>] stop.") (alteration in original)(internal quotation marks omitted).

   **C.  Silva's Stop of Plaintiff**

   At the outset, it bears noting that Silva and Colt stated that Plaintiff and his friends were on the sidewalk, not the porch.  <u>See</u> Plaintiff's Exhibits at 4.  "Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment."  <u>Klaucke</u>, 2010 WL 431876, at *3; <u>see also</u> <u>Hiibel v. Sixth Jud. Dist. Ct. of Nevada</u>, 542 U.S. 177, 185, 124 S.Ct. 2451 (2004)("Asking questions is an essential part of police investigations.  In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.").  Thus, Plaintiff is not entitled to summary judgment with respect to his claim based on an alleged unlawful stop by Silva.

   To the extent that Silva's questioning of Plaintiff may have at some point progressed to the point of being a <u>Terry</u> stop, the Court finds that such stop was justified.  Silva and Colt were on patrol in a neighborhood where the police had received numerous complaints of criminal activity, Tr. T. at 5, and Silva and Colt were aware of the complaints, <u>id.</u> at 14-15.  Police are permitted to take the character of the neighborhood into account when assessing whether a stop is appropriate.  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124, 120 S.Ct. 673 (2000)("[W]e have previously noted the fact the stop occurred in a 'high crime area' among the relevant contextual considerations in a <u>Terry</u> analysis."); <u>United States v. McKoy</u>, 428 F.3d at 40 (stating this, but noting "it is only one factor that must be looked at alongside all the other circumstances when assessing the reasonableness of the officers' fear for their safety").  <u>But see</u> <u>Wright</u>, 582 F.3d at 224 ("[L]abeling an area 'high crime' raises special concerns of racial, ethnic, and socioeconomic profiling.")(quoting <u>United</u>

States v. Caruthers, 458 F.3d 459, 467 (6th Cir. 2006)(Lipez, J., dissenting))(alteration in original).  The hour was relatively late, 10:18 p.m., Tr. T. at 5, and the presence of four men together on the sidewalk was a circumstance which could reasonably attract Silva's attention.  When asked for identification, Plaintiff was unable to produce any document with his name on it.

Most significant, however, is the fact that Silva had received information that Plaintiff had been involved in a housebreak and that he would be arriving a 85 Parade Street in a vehicle accompanied by a second vehicle.  The description of both vehicles matched the description provided by the informant. While hardly conclusive of the rest of the informant's tip, the confirmation of this portion of it, along with the other circumstances already noted, was sufficient to give Silva a reasonable suspicion supported by articulable facts that criminal activity was afoot, warranting a brief investigatory stop.[40]  See United States v. Campa, 234 F.3d 733, 737 (1st Cir. 2000)("a police officer with reasonable suspicion of criminal activity may detain a suspect briefly for questioning aimed at confirming or dispelling his suspicions").

---

[40] Although there is no evidence in the record regarding the reliability of the informant who provided the information to the police, it appears that Silva and Colt had face to face contact with him and that his identity may even have been known to them.  See Colt's Answers, Ans. No. 18 (Colt recounting that "[t]he informant then approached the plaintiff and the persons that accompanied him"). A face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant.  United States v. Heard, 367 F.3d 1275, 1279 (11th Cir. 2004).  Moreover, even an anonymous tip, sufficiently corroborated, can exhibit sufficient indicia of reliability to justify an investigatory stop.  Alabama v. White, 496 U.S. 325, 332, 110 S.Ct. 2412 (1990); see also id. at 330 ("the level of suspicion required for a Terry stop is obviously less demanding than for probable cause").

45

Viewing the evidence in the light most favorable to Silva, the Court finds that the information provided by the informant, corroborated by the officers' own observations, gave Silva a reasonable suspicion supported by articulable facts that Plaintiff was engaged in criminal activity. Accordingly, the Court finds that a <u>Terry</u> stop was justified. To the extent that Plaintiff seeks summary judgment based on his claim that Silva's detention of him was unjustified, Plaintiff's Motion should be denied. I so recommend.

### D. Silva's Pat-Down of Plaintiff

Silva asked the men for identification, but only two of them were able to produce any. Tr. T. at 7. Plaintiff identified himself as "Philip Polanco,"[41] <u>id.</u> at 8, and stated that he did not have any identification, <u>id.</u> at 9. Silva then performed a pat-down search of Plaintiff. Colt's Answers, Ans. No. 18.

Given the lateness of the hour, Plaintiff's inability to produce any identification, the fact that Silva and Colt were outnumbered by the men two to one, and, most significantly, the information that Plaintiff had been involved in a housebreak and the partial confirmation of that information by the officers' own observations, the Court finds that Silva was justified in performing a pat-frisk for weapons. Housebreaking is a crime of violence, <u>see</u> <u>United States v. Gardner</u>, 397 F.3d 1021, 1024 (7th Cir. 2005)(agreeing with Fifth and Tenth Circuits that "Residential Entry is a crime of violence because of the serious risk that an occupant could be injured"), and Silva reasonably suspected that Plaintiff had some nexus with a housebreak. Once Silva had reasonable suspicion justifying a stop, he was

---

[41] Plaintiff acknowledged at his deposition that he has used a number of aliases. <u>See</u> Dep. T. at 33-39. Although he identified himself as "Felipe Almonte," Dep. T. at 3, at the start of the deposition, later when asked about his aliases he stated: "I go by Felipe Polanco, P-O-L-A-N-C-O," <u>id.</u> at 33.

permitted to take actions for his own safety.  <u>Schubert</u>, 589 F.3d
at 503.  Under the circumstances, this included a pat down search
for weapons.  Accordingly, Plaintiff's Motion based on the <u>Terry</u>
search conducted by Silva should be denied.[42]  I so recommend.

### E.  Interference with Phone

Silva repeatedly told Plaintiff not to call anyone on his
phone, and Plaintiff repeatedly disregarded Silva's instructions.
Plaintiff contends that Silva had no lawful basis to prevent
Plaintiff from using his phone.  Again, given the circumstances,
Silva could have reasonably believed that allowing Plaintiff to
place the call would enable Plaintiff to summon additional
persons to the scene, further increasing the numerical
disadvantage which the two officers already faced.  Accordingly,
to the extent that Plaintiff seeks summary judgment on his claim
that Silva prevented him from making a telephone call,
Plaintiff's Motion should be denied.  I so recommend.

### Conclusion

For the foregoing reasons, I recommend that Defendants'
Motion for Summary Judgement be granted as to Silva except as to
Plaintiff's claims based on acts which occurred before Plaintiff
was arrested.  Those acts are the initial stop and detention of
Plaintiff, the search of his person,[43] and the attempt to take
his phone.  I recommend that Defendants' Motion for Summary
Judgment be granted as to Colt, Esserman, and the City of
Providence as to all claims.  I recommend that Plaintiff's Motion
for Summary Judgment be denied.

Any objections to this Report and Recommendation must be
specific and must be filed with the Clerk of Court within

---

[42] Silva denies performing a more intrusive search than a <u>Terry</u>
pat-down.  Silva's Answers, Ans. No. 13; <u>see also</u> Colt's Answers, Ans.
Nos. 10, 18, 19.

[43] <u>See</u> n.25.

fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. <u>See</u> <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

<u>/s/ David L. Martin</u>
DAVID L. MARTIN
United States Magistrate Judge
March 3, 2010